## Rockland Township Supervisors

*McGill & McGill*, for petitioners.

*Nesbitt & Wasson*, for respondents.

BRAHAM, P. J. (fifty-third judicial district, specially presiding), October 27, 1947.—This is a proceeding for the removal of township supervisors. It was brought under the provisions of The Second Class Township Law of May 1, 1933, P. L. 103, sec. 503, 53 PS §19093-503, which reads as follows:

"If any township officer refuses or neglects to perform his duties, the court of quarter sessions, upon complaint in writing by twenty-five citizens, owners of real estate residing in the township or district, may issue a rule upon such officer to show cause why his office should not be declared vacant and another appointed in his stead. Such rule shall be made returnable not less than two weeks from its date of issue. Upon hearing, and proof that the facts alleged in the complaint are true, the court may declare the office vacant and appoint another in his stead, to hold office during the term of the officer deposed."

Section 510 of the Act of 1933 (53 PS §19093-510) provides: "The general supervision of road affairs in every township shall be in the hands of three qualified electors of the township, who shall be styled township supervisors." Section 410 of the act fixes their terms at six years. Section 516 of the act (53 PS §19093-516) specifies their duties. The term of township supervisors is thus six years subject to a prior determination if the court of quarter sessions upon proper proceedings finds that they "refuse or neglect to perform their duties": Milford Township Supervisors' Removal, 291 Pa. 46.

Section 504 of the Act of 1933 (53 PS §19093-504) empowers the court, if a petition for removal alleges a failure to maintain the roads according to law, to "appoint three persons, who shall examine said highways and report to the court their findings", security being entered. This was apparently the procedure which the 39 petitioners attempted to follow because a bond accompanied the presentation of the petition to court but no inspectors were ever appointed. The petition for removal was first presented to the president judge of Venango County but after he was incapacitated by injury the case was heard by two successive judges sitting specially. The writer of this opinion was the judge before whom the case was finally heard, the pend-

ing motion for a more specific petition having been waived.

Petitioners allege a failure of the three elected supervisors of Rockland Township to perform their duty to keep the roads open and passable. The evidence taken indicates that certain roads were impassable during the muddy season because of the mud and impassable during the winter season because of drifted snow.

Before examining in detail the evidence to support these charges it is necessary to have the general nature of the township in mind. Rockland Township lies south of the City of Franklin, the county seat, and north of the Borough of Emlenton. It is bounded on the west by the Allegheny River which there follows a tortuous course between high hills. A few villages are dotted over the township, some on the river, others inland. There are no large industries but there is some oil and gas production and some coal mining. It is essentially rural but many people live there and work in the towns. There are in the township about 13 miles of State road for which, of course, the commissioners are not chargeable.

There are about 48 miles of township road, none of it with concrete or macadum surface but a few miles with a stone base and gravel top. The hills along the river rise to a height of 700 or 800 feet. Six or seven of the roads run down these steep hills to the river. There are four bridges to keep up.

The taxable property in the township was valued in 1946 at $531,290 and occupations were valued at $48,-600. The constant tax millage since 1936 has been five mills, two mills of which are needed for debt service. This, it will be noted, is less than the maximum. Section 905 of the Act of 1933 as amended by the Act of March 28, 1945, P. L. 86, 53 PS §19093-905, limits the tax rate for road, bridge and general township purposes to seven mills with two additional mills when

necessary for debt service. The court may also, for cause shown, authorize additional millage not to exceed seven mills.

Of the three supervisors whose conduct of their office is attacked, the chairman, Ivan M. Smith, has served 11 years and his term will expire the end of 1947; James K. McCord has served more than seven years and has about four years to serve, and Charles Hanst has served four years, partly by appointment, and his term will expire with the end of 1949.

Seventeen witnesses were called by petitioners to show that the general condition of the roads is and has been for the past year very bad. They complain about their inability to get through the mud in automobiles during wet weather because of the deep mud and during wintry weather because of the deep snow. It has been impossible to hear the testimony of these witnesses and to read their written testimony without a conviction of the truth of their statements and a profound sympathy for them. One of the witnesses, John Shull, who has moved out of the township after a lifetime on dirt roads said: "I was sick and tired of being penned in half a year. That is one reason why I left Rockland, to get out where it was civilized, where good roads was. The first good road I ever lived on in my life." Good roads have indeed been the mark of civilization since the time of Julius Caesar.

This poses one of our problems. Mud roads and motor vehicles do not go well together. Witness after witness told of being stuck in the mud. Edward A. Myers, a grocer of Kennerdell, complained about the road from Smith's Corners to Brandon. So did W. B. Mallery, a leaser from Franklin, Alfred Taylor, a fire warden, and Mr. and Mrs. Alfred Shook, residents of the road. This is one of the roads which goes down the river hill to Brandon. Myers also complained about the Titus Road. George Titus, farmer, and G. Domer McElphatrick, farmer and oilman, Richard Hancox, a leaser,

John Shull and Valeria Burgwin, established that a portion of this road is often impassable in deep mud during the bad weather. The road to East Sandy was shown to be often difficult of passage because of deep mud. Benjamin T. and George Holman so testified as did William Young, former railroader, and Clarence Dicks, a former supervisor. The similar muddy condition of the the Pine Hill Church Road was shown by the mailman, Howard Potter, by George Hull, a farmer, and by Gerald Hatch, a plumber. There is a great measure of truth in all these complaints. Petitioner, Edward A. Myers, who was most active in the case, testified that all the dirt roads in the west part of the township were impassable. He mentioned specifically 12 miles of road. In wet weather the mud on these roads did get so deep that automobiles would frequently stick and sometimes be broken. Motorists often have had to leave their vehicles and proceed on foot. Some of these complaints relate to prior years, but for the most part they relate to the latter part of 1946 and the first half of 1947.

An examination of the evidence relating to the clogging of the roads by snow also compels the conclusion that here also there is truth in the complaints. The witnesses Myers and Potter tell about the closing of the Pine Hill Church Road, the Titus Road and others by drifting snow. Clarence Dick says he was shut in on the East Sandy Road by every hard snow. There was some evidence of failure to remove snow in previous years; William Young said he had complained to the district attorney two years ago; but in the main the complaints relate to the late winter of 1946-47.

The defense to the charges concerning roads closed by deep mud and roads closed by snow is the same. In each case the supervisors did the best they could with the men, materials and money at their disposal. At this point some findings in favor of the supervisors must be indicated. During the years 1946 and 1947

it was difficult to get satisfactory men to work on the roads and it was almost impossible to get new mechanical equipment. Comment about the money available will be made later.

The supervisors have produced a very respectable body of witnesses to corroborate their contention of duty performed as well as possible under the circumstances. In addition to the three supervisors and Marshall Rowe, their roadmaster, they produced as witnesses: Bert Bailey, a mail carrier; Paul Lehman, superintendent of township schools; L. E. and G. I. Hughes, oil men; Raymond Feltenberger, former employe of petitioner; G. Domer McElphatrick; Joseph G. Hetzler, a former roadmaster, and H. T. Jolley, a former supervisor. This impressive group of witnesses, together with the known difficulties of the past two years immediately following the great war, compel a closer examination of the conditions which petitioners have shown to exist.

What do petitioners suggest? They point to the availability of gravel in the township and contend that the commissioners, upon receiving complaint about a mud hole which was stopping traffic, should have taken a few loads of gravel and put in the mud hole. They call attention to the balance of over $5,000 carried over the preceding year by the supervisors and contend that it was dereliction of duty not to have used this sum at least to get people out of the mud.

Petitioners also point somewhat scornfully to the activity of the supervisors in working the roads each year with a road scraper and then dragging them. From petitioners' point of view it is futile to plow the mud out of the ditches, pile it upon the top of the road and then drag the road. This is the burden of testimony of George Titus and Walter B. Mallery. Mallery said no good is done by scraping. He says the ruts should be filled with gravel. Yet Myers complains because the ditches have not been opened enough. Then, too, peti-

tioners apparently believe that the supervisors should not spend time and money cutting brush or repairing guard rails; they should concentrate upon obtaining a good surface to drive upon.

The rejoinder of the supervisors discloses the principal point of law involved in the case. They say they do not believe in a piecemeal patching of bad spots in the roads. The only sound plan, in their belief, is to improve one section of road at a time as they are able. They believe that gravel on a stone base or a thicker layer of gravel alone will make an acceptable surface for their dirt roads and that anything else is useless. Attempts to patch roads have failed, so they say. The evidence does disclose attempts on their part to repair small sections. Howard Potter says the supervisors did try to fix the roads if the demands were not too great. The Titus Road was partially graveled. Benjamin T. Holman says they filled a hole but with sand that was too fine. Alfred Taylor said they fixed the Pine Hill Church Road upon request. The testimony of Gerald Hatch shows how the piecemeal system of repair failed. He says that a couple of loads of gravel were put in a hole in the road which leads from Pine Hill Church to the East Sandy Road but that when the frost went out the road was worse than ever.

The witnesses for defendant are quite clear in their belief that the piecemeal system will not work. Chairman Ivan M. Smith says to go on muddy roads with gravel to fix bad spots tears up more road than it repairs. James McCord says it is impossible to get to the bad spots. Charles Hanst and Marshall Rowe testified that it is impossible to haul when the roads are bad.

The supervisors have had an intelligent plan for improving permanently a section of road each year. They were prevented from following the plan during the war. They have spent more this year than the $2,500 raised by taxes and the $4,000 received by the State and the $5,000 in their treasury is but the ac-

cretion of the war years. One thousand dollars of it must go for the debt of the township and there is included a like amount for a graveling project which has to be canceled because the men and materials were not to be had. The pending proceeding has also deterred them. These facts we find in favor of respondents.

The supervisors stand by their use of the road grading machine. They say it is the best way to secure drainage and to maintain a proper surface. They turn the dirt out of the ditches and then drag the road. Here the elements have worked against the supervisors. The evidence discloses and we have no hesitation in finding that there has been much rain during the early part of 1947. Well up into July there were frequent and heavy rains. This has been one principal cause of the difficulty with the roads in Rockland Township this year. In ordinary years when the mud is thrown from the ditches into the center of the road drying weather and a little dragging will restore the surface. This year drying weather was lacking and motor traffic cut up the road and made it worse after the scraping.

Section 516 of the Act of 1933 (53 PS §19093-516), as amended, states in detail the duties of the supervisors but nowhere requires them to keep all mud roads open for traffic at all times. They are required to "cause such highways and bridges to be kept in repair and reasonably free from all obstructions". They are required to "employ . . . such persons, teams and implements as may be necessary for the maintenance and repair of highways and bridges and the removal of obstructions caused by snow", to "construct and keep in repair all sluices and culverts, and keep the waterways, bridges and culverts open" and to "cause loose stones . . . to be removed". Respondents are chargeable with 48 miles of mud roads. The legislature was wisely silent as to how far they must go to keep their people out of mud. The supervisors are re-

quired more specifically to keep the ditches open and to drag the highways and remove loose stone than they are to haul gravel to put in mud holes.

The decisive point of law is found in the nature of the office of supervisors. To them is entrusted the making and execution of plans for the care of the roads. So long as these plans are lawful, made in good faith and carried out with reasonable diligence and without intent to injure any individual the courts will not interfere although some citizens and even the courts might prefer some other plan. No bad faith or fraud is found on the part of any supervisor and reasonable diligence has been shown, once the plan of the supervisors is understood.

The adjudicated cases in which removal of supervisors has been ordered are found to involve breaches of some mandatory duty. For example, in Crane's Appeal et al., 344 Pa. 624, the supervisors failed to file a budget and a required statement with the State Highway Department. In re Fairmount Township, 20 D. & C. 460, the supervisors failed to comply with the law governing purchases of materials. Where supervisors contract a debt in excess of the legal limit they may be dismissed from office: In re Moyer et al., 22 Luz. L. R. Rep. 130.

On the other hand it has been held that a supervisor who has been charged with failure to keep roads in repair cannot be removed for mere incompetency: Bald Eagle Township Supervisors, 5 D. & C. 39. Removal of Supervisors of Spring Brook Township, 24 Lack. Jur. 304, was another case in which the court refused to oust supervisors elected by the people because with $1,800 at their disposal they had failed to keep 42 miles of mud road passable during a wet spring. Commonwealth v. Patton Township Supervisors, 13 D. & C. 131, is another case very much like the one at bar. There the supervisors who had a gross duplicate of $2,200 failed to keep 32 miles of mud road open.

Some people could get through, others could not, just as in the present case. The court refused to discharge the supervisors. So in Snyder's Case, 13 D. & C. 143, the court refused to dismiss a supervisor because he had failed to keep mud roads passable in wet weather, there being no flagrant abuse of official duty. To the same effect is Petition of Isamoyer et al. v. Conrad et al., 22 Berks 193.

In passing upon the conduct of the three supervisors of Rockland Township we have not overlooked the alleged failure to remove the snow from the roads. On this point the weight of the credible evidence was clearly in favor of the supervisors. That there were snowdrifts which blocked the road for some days cannot be controverted, but in the main the supervisors worked faithfully and efficiently to keep the roads clear. Paul Lehman, who has charge of the schools of the township, testified that the roads traveled by the school buses were kept reasonably clear. In fact he had as much or more trouble with the State roads than with the township roads. Bert Bailey, a mailman, said the roads in Rockland were kept better cleared of snow than those in an adjoining township. He could get through the Rockland Township roads when he could not traverse the State roads. We find from the evidence that the late winter of 1946-47 was marked by heavy drifts of snow which closed the same roads again and again. We find also an inability to buy the snow fence which would have protected some areas. No decree of ouster could be based upon respondents' failure to keep the roads clear of snow.

Finally, it must be considered whether respondent supervisors by a failure to levy tax mileage up to the limit allowed by law and to devote this additional money to repair of the roads have been guilty of such wilful neglect as will require their dismissal. The supervisors have satisfactorily explained the amount of money which they have in their hands. Should they

have levied more? Rockland Township has proceeded in a conservative way. The tax levy has been five mills instead of seven or nine mills. This again is a part of the plan of the supervisors. It is an exercise of discretion with which the court ought not to interfere. If this court were to remove supervisors because they did not levy enough taxes, the court would soon in effect be fixing all road tax levies. If this court removed the supervisors because they followed the long-distance plan for the improvement of township roads which they believed sound, instead of yielding to the pressure and clamor of those who demanded immediate relief from the mud and snow, it would soon be impossible to find men of sense and firmness to hold the office of supervisor.

If the plans of the three supervisors are unsound and unjust the true remedy of petitioners is to elect other supervisors. The tax of five mills has been levied for school purposes ever since 1936. During this time two of the supervisors have been reëlected and one has been elected. The people have thus ratified their action. The court is, and should be, loath to remove these officers chosen by the people. If fraud or oppression appeared we should not hesitate to do so; but in view of the difficult times through which we have been passing, the greatly increased volume of motor traffic on dirt roads and the valid body of evidence which says the supervisors have done well, we cannot remove them.

Our views have been stated at great length because we feel keenly the difficulties under which petitioners have suffered. The sense of our opinion is that these difficulties do not require nor allow dismissal of the supervisors. Entertaining these views we make the following

### Order

Now, October 27, 1947, the petition is dismissed at the cost of petitioners.